IN THE MATTER OF: THE ADOPTION AND CUSTODY
OF KAREN DAWN UNDERWOOD

(No. 10977)

Submitted January 27, 1959. Decided March 31, 1959.

*W. Bernard Smith*, Assistant Attorney General, *Harold A. Bangert, Jr.*, Special Assistant Attorney General, for appellant.

*William V. McNemar, Jr.*, for appellees.

BROWNING, JUDGE:

An appeal and supersedeas was granted by this Court on March 31, 1958, upon application by the West Virginia

Department of Public Assistance, hereinafter referred to as the "Department", to a decree of the Circuit Court of Wyoming County, entered October 5, 1957, whereby a previous order of that court, entered July 30, 1956, committing an infant, Karen Dawn Underwood, to the permanent care, custody and guardianship of the Department, was set aside, and all rights, duties, privileges and relations between Karen and the Department declared at an end, and permanent custody of Karen was granted and committed to Burgess and Jessie Ann Miller.

The instant appeal makes the fourth time in which the parties to this proceeding have been before this Court in one manner or another, and while, perhaps not directly pertinent to the question here involved, it is thought that a brief recital of the background, in addition to the facts necessary for a determination of the instant question, will be helpful.

Karen Dawn Underwood, the infant child of an unmarried woman and an unknown father, was born January 13, 1956, in Bluefield, West Virginia. Previously, on May 19, 1955, the Department had entered into an agreement with Burgess and Jessie Ann Miller, which agreement, styled: "Agreement By Foster Parents", provided in part as follows:

> "We agree:
>
> "* * *.
>
> "11. To cooperate with the Department of Public Assistance in carrying out the Department's plan for a foster child, including the plan to return a child to his parents, to transfer him to another foster home or institution, etc.
>
> "* * *.
>
> "13. That a child placed in our home will not be available to us for adoption.
>
> "I have read the above statements and agree to accept children for care, under these provisions.
>
> > "(s)  Burgess Miller, Foster Father

"(s)   Jessie Ann Miller, Foster
Mother."

Pursuant to the above Agreement, Karen, on January 20, 1956, was placed in the Miller's home. Thereafter, on March 6, 1956, the mother of Karen executed a release of all parental rights to the Department, including the right to consent to adoption, and, on July 30, 1956, upon petition of the Department, Karen was adjudged by the Circuit Court of Wyoming County to be a dependent and neglected child and committed to the permanent care, custody and guardianship of the Department.

In March, 1957, the Department notified the Millers that in the latter part of that month, the Department would take Karen and place her for adoption. The Millers then, on March 20, 1957, obtained an injunction in the Circuit Court of Wyoming County restraining the Department from removing Karen from the Millers' home for sixty days, on the ground of her illness. The Department applied to this Court, under its original jurisdiction, for a writ of prohibition prohibiting the Judge of the Circuit Court of Wyoming County from enforcing the injunction order, and for a writ of habeas corpus ad subjiciendum commanding the Millers to surrender custody of the child. A rule or writ, as proper, was issued in the cases April 29, 1957, returnable May 14, 1957. Meanwhile, the Millers, on May 8, 1957, filed their petition in the instant proceeding in the Circuit Court of Wyoming County seeking to adopt Karen, or, in the alternative, to be awarded permanent custody, and a hearing was set thereon on May 16, 1957. The Department again applied to this Court for a writ of prohibition prohibiting any further proceedings upon the adoption petition pending a determination of the two cases then before it, pursuant to which a rule in prohibition was issued May 10, 1957, returnable May 17, 1957, the same day to which the other two cases had been continued. The writ in the first prohibition case was denied and the writ of habeas corpus was discharged by this Court on June 25, 1957, for reasons stated in a written opinion reported in 142 W.

Va. 855, 98 S. E. 2d. 783, two Judges dissenting to the discharge of the writ of habeas corpus. Thereafter, counsel for the Department electing to try the issue of custody in the instant proceeding, the second rule in prohibition was discharged and the petition dismissed upon motion of petitioners. In the instant proceeding, the Millers, having announced prior to the hearing that they would not seek adoption, but only permanent custody, the Circuit Court of Wyoming County, as hereinbefore mentioned, set aside its previous order of July 30, 1956, awarding custody of Karen to the Department, and awarded permanent custody to the Millers, to which order this Court granted an appeal and supersedeas.

It was held in *Stout* v. *Massie,* 140 W. Va. 731, 88 S. E. 2d. 51, that courts of equity have jurisdiction to determine the custody of an infant, and, treating this proceeding as one in equity, the Circuit Court of Wyoming County is a proper tribunal to hear and determine the matters pertaining to the custody of infants. Of course, habeas corpus is a proper remedy to determine the custody of an infant, and such a proceeding is at law. It would thus appear that under the former holdings of this Court a circuit or juvenile court, in a proper case, has jurisdiction to determine the custody of an infant on either the law or equity side. This question is discussed at some length in *Stout* v. *Massie, supra,* and in *Hammond* v. *Department of Public Assistance,* 142 W. Va. 208, 95 S. E. 2d. 345.

Article 4 of Chapter 48 of the Code, all of the eight sections having been amended since the adoption of the official Code in 1931, provides for the adoption of minor children, as well as adults. Section 1, pertaining to the adoption of minor children, provides that the written and acknowledged consent of the parent or parents if living is a prerequisite to such adoption, and that, if the parents have been deprived of the custody of the person of such child by law, the written consent of "the legal guardian of such child or those having, at the time the legal custody of the child, shall be obtained and so presented"

is a prerequisite to the granting of the relief sought in such proceeding. This language would indicate the reason why petitioners herein abandoned their efforts to adopt Karen since the Department had the legal custody of the child.

At the hearing, the petitioners testified and presented sixteen other witnesses, most of whom were neighbors of the Millers, and all of whom testified to the good characters, habits, et cetera, of the Millers and that they were proper persons to have the custody of this infant. Reverend Norman K. Morgan, pastor of a church in the Town of Pineville, testified as a witness for the petitioners. He has two degrees from reputable institutions of higher learning, including considerable work in the field of sociology. This witness was appointed by the trial court to make an investigation of this case after the filing of the adoption petition, and a copy of his report is a part of the record. His testimony was favorable to the Millers as being proper persons to adopt or have the custody of this child, but he expressed regret that the Millers were not members of any church. Although he was of the opinion that the Department left this child in the Millers' home too long before finding adoptive parents for it, he expressed the belief that it would have been better to have left the child in this home for a period of fourteen months than to have moved it from one foster home to another during that period of time. It was his belief that to remove the child from the Millers' home after it had been there for a period of fourteen months would have a "traumatic" effect upon the child.

Only two witnesses testified on behalf of the Department, Beulah Basham and Lillian S. Nagy, the former being a Child Welfare Worker for the Department, and the latter being Chief of the Division of Child Welfare of the Department. The educational background of the witness Basham was not developed, but the witness Nagy testified that she had received a Bachelor of Arts degree from George Washington University, and a Master of Arts degree from the University of Chicago School of

Social Service Administration. She stated that she had majored in psychology. Made a part of the record in this case as an exhibit were the official entries, in the records of the Child Welfare Division of the Department, of the witness Basham, which covers twenty-seven pages of the printed record, and goes into considerable detail concerning her relationshhip with Karen and the Millers. Between January 20, 1956 and March 18, 1957, she visited the child at the Millers' home approximately thirty-one times, and considerable notes concerning the child and the Millers were made subsequent to each visit. The evidence of the witness Nagy is to the effect that the investigation of the Millers' home resulted in its approval as a foster home, but that she would not have approved the Millers as adoptive parents. Perhaps the principal reason that she gives for this opinion was the fact that the Millers had a seven year old natural child. She stated in her testimony that it was the firm practice of the Department not to place a child in a home for adoption where there were natural children, although formerly such had been the practice on some occasions and it proved unsatisfactory, particularly to the adopted child. This witness further testified that the removal of Karen from the Millers' home would result in some shock to the child, but it was her opinion that the benefits to be derived from becoming the adoptive child of the persons who had been selected for that purpose, in a city scores of miles from Wyoming County, would more than offset the temporary "traumatic" injury. There was, of course, no testimony concerning the home of the prospective adoptive parents because of the policy of the Department not to reveal the names of such persons until application is made to a proper court in the county where they reside at the time formal adoption is sought.

The witness Nagy testified also that there was delay in the processing of applications for adoption with regard to this child because of the Department's interpretation of 49-3-1, which reads: "* * * Provided, that an unwed mother may repudiate said relinquishment within one hundred and twenty days from the date of said re-

linquishment, by a written and acknowledged notice and statement to said child welfare agency to such effect." However, in *State Department of Public Assistance* v. *Pettrey,* 141 W. Va. 719, 92 S. E. 2d. 917, this Court held that provision applied "only where the relinquishment was made to a licensed child welfare agency" and not where such relinquishment was made to the State Department of Public Assistance. The evidence of the Department also showed that further delay was caused in "matching" the child to proper adoptive parents because of a temporary lack of personnel.

Chapter 1 of the 1936 Acts of the Legislature, First Extraordinary Session, as amended, now Chapter 49 of Michie's Code, 1955, provides a "comprehensive system of child welfare throughout the State." By that Act, the Legislature provided that: "The child welfare service of the State shall be administered by the state department of public assistance, the several county departments, and the licensing board herein provided in accordance with the provision of this chapter."

Section 1 of Article 2, of that Chapter, provides that: "It shall be the responsibility of the state department to provide care for neglected children who are committed to its care for custody or guardianship. The state department may provide care for such children in family homes meeting required standards, at board or otherwise, through a licensed child welfare agency, or in a state institution providing care for dependent or neglected children. * * *"

Section 2 of Article 2, of the Chapter, provides that: "A child committed to the state department for guardianship, after termination of parental rights, shall remain in the care of the department until he attains the age of twenty-one years, or is married, or is adopted, or guardianship is relinquished through the court." "A child committed to the state department for custody shall remain in the care of the department until he attains the age of twenty-one years, or until he is discharged because he is no longer in need of care."

Section 2 of Article 5, of this Chapter, reads as follows:

> " 'Child' means a person under the age of eighteen years. When jurisdiction shall have been obtained by any court of competent jurisdiction in the case of any child, such child shall continue under the jurisdiction of the court until he becomes twenty-one years of age unless discharged prior thereto or is committed to a correctional or other institution. A person subject to the jurisdiction of the juvenile court may be brought before it by either of the following means and no other:

> "(a) By petition praying that the person be adjudged neglected or delinquent;

> "(b) Certification from any other court before which such person is brought, charged with the commission of a crime."

Three recent decisions of this Court will be reviewed since they are conclusive of the issues presented upon this appeal: *State Department of Public Assistance* v. *Pettrey, supra; Hammond* v. *Department of Public Assistance, supra;* and the original jurisdiction proceedings in habeas corpus and prohibition styled: *West Virginia State Department of Public Assistance* v. *Miller, et al.,* and *State ex rel. West Virginia State Department of Public Assistance* v. *Worrell, Judge, et al.,* 142 W. Va. 855, 98 S. E. 2d. 783, which will hereinafter be referred to as the *Pettrey, Hammond* and *Miller-Worrell* cases.

The *Pettrey* case was an original proceeding in habeas corpus in which the Department sought custody of an infant from the Pettreys, in whose home the child had been placed by the Department under a Foster Home Agreement. The facts of that case and the instant one are very similar. In the *Pettrey* case, the mother, an unmarried woman over the age of twenty-one years, executed an instrument by which she relinquished the legal custody of her new born child to the Department, and gave the Department the power to consent to its adop-

tion. Just as in this case, the Pettreys repudiated their agreement, sought out the mother of the child, received from her a written consent to the adoption of the child and filed their petition for adoption in the proper court of Mercer County. That proceeding was dismissed without prejudice, but the Pettreys refused to deliver to the Department the custody of the child, and in an original proceeding in habeas corpus this Court directed the Pettreys to do so. In the opinion, this statement appears: "Much of the evidence before the Court relates to the nature of the home of defendants and the care which they are able to furnish the infant. From such evidence, it appears reasonably certain that defendants are capable of affording the infant a good home and sufficient care and are anxious to do so. It must be remembered, however, that defendants accepted custody of the infant as 'foster parents' for temporary custody only, and they expressly contracted 'to cooperate with the Department of Public Assistance in carrying out the Department's plan' for the infant. There is no showing, of course, that the Department of Public Assistance can not or will not provide a home for the infant the equivalent of the one which would be furnished by defendants. While courts always look to the best interests of the child in such controversies,we know of no rule of law requiring the denial of legal custody of an infant to one legally entitled thereto merely because some other person might possibly furnish the child a better home or better care."

The *Hammond* case may be distinguished from the *Pettrey* case upon both the facts and the applicable statutory law. In the *Hammond* case, the petitioners sought a transfer of the custody of an infant boy from the Department of Public Assistance of Doddridge County to themselves. On April 9, 1953, the Juvenile Court of Doddridge County found this boy to be a neglected child, and awarded his custody to the County Department "to be received, detained, managed and controlled in the manner as would best concern his welfare.", and ordered his father to pay to the Department the sum of $10.00 a month for his support. The Department placed the boy

in the home of the petitioners where he remained for a period of fourteen months when the Department removed the child to another county and placed him with other people. It is to be observed that the statutory law pertaining to the State Department and County Departments, with reference to neglected children, is different. 49-2-16, provides that:

> "The county departments of public assistance are authorized to provide care, support and protective services for children who are handicapped by dependency, neglect, illegitimate birth, mental or physical disability, or who for other reasons are in need of public service. The county departments of public assistance are hereby authorized and empowered in their discretion to accept children for care from their parent or parents, guardian or relatives and to accept the custody of children committed to their care by courts exercising juvenile jurisdiction.

> "The county departments of public assistance shall provide care in special boarding homes for children needing detention pending disposition by a court having juvenile jurisdiction or temporary care following such court action."

Whereas the County Department is granted authority only for temporary care and support of such children, and has no power to enter into agreements with a parent or parents for the relinquishment of children, or the right to consent to their adoption, it is otherwise with the State Department, as heretofore noted by the provisions of 49-2-2. No agreement between either of the parents of the Hammond boy and the Department had been entered into relative to granting consent for adoption. Furthermore, in the *Hammond* case, this Court held that the Foster Home Agreement between the petitioners and the Department of Public Assistance was breached by the Department when it removed the child from the petitioners' home and took him to another county. It will be observed also from the language of the opinion in the *Hammond* case that this Court based its decision

in affirming the trial court's judgment, giving the custody of the child to the petitioners, upon the testimony showing that the child had too often "been moved from place to place with his meager supply of clothing and his pitiful childish toys making up all of his worldly goods." The contention in the instant case is to the contrary, i.e., that the Department left Karen with the Millers too long. In the opinion in the *Hammond* case is this pertinent paragraph: "It is to be noted that this case may be distinguished from the case of State Department of Public Assistance v. Pettrey, supra, since in the Pettrey case the unwed mother executed to the Department of Public Assistance, very soon after the child's birth, an instrument surrendering her parental rights and giving to such Department the power to consent to his adoption. In the instant case, no such relinquishment or power to consent to adoption has ever been given the Department; the Department gained control of the child in a proceeding in Doddridge County to declare Delbert Hammond a neglected child. However, the appellees have obtained such relinquishment and consent to adoption from Lawrence Hammond, father of the child."

The original proceedings in habeas corpus and prohibition, as heretofore stated, relating to the custody of the same Karen Dawn Underwood, were disposed of by this Court in a single opinion. This Court unanimously held in the prohibition proceeding that the trial court had jurisdiction to restrain the Department, though the latter had legal custody of the child, from removing it from the foster home for a period of sixty days because of the illness of the infant. However, in the habeas corpus proceeding, this Court was divided three to two in denying the Department the right to the immediate custody of the child, the dissenting Judges being of the opinion that since the sixty day injunctive period had passed, the Millers should be required to deliver the child to the Department. In the majority opinion, the *Pettrey* and *Hammond* cases were distinguished, and the Court said: "We are of the opinion that there is no conflict in the principles

expressed and the decisions rendered in the Pettrey and Hammond cases, and that any application of those principles depends, as it did in those cases, upon the circumstances of each case. We consider the Foster Parents Agreement here, so far as this record discloses, a valid and binding agreement between the parties, and we recognize the principle that the courts have jurisdiction, under proper circumstances, over a temporary control of infant children when necessary to protect their health and welfare, regardless of the matter of legal right to the custody of the child, * * *." This significant paragraph also appears in the majority opinion: "We see no merit in respondent's contention that the petitioner did not have a suppplemental agreement as to this child as was had in the Pettrey case, because the terms of the Foster Parents Agreement are very comprehensive, and the parties acted in accordance with it. Any supplemental agreement would be merely confirmatory or cumulative insofar as the matters here involved are concerned. Nor do we think that the action of the petitioner in July, 1956, having this child adjudged a neglected and dependent child destroyed the contractual obligation imposed by the Foster Parents Agreement, as that proceeding only confirmed certain powers in the petitioner with regard to the child."

In the instant case, the attempted repudiation of the relinquishment agreement by the mother was invalid, as was held in the *Pettrey* case, and the Millers are bound by the Foster Home Agreement between them and the Department. Article 6 of Chapter 49, provides for "Procedure in Neglect Cases". The first section provides that the State Department "or a reputable person" may file a petition, in a court having jurisdiction of such cases, to have an infant declared to be a neglected child. The procedure follows in the next four sections, Section 5 providing that, if the infant is found to be a neglected child, the court may do one of five things, among them being: "(3) When necessary for the welfare of the child, terminate the parental rights and responsibilities of the

parent or parents of the child and commit the child to the permanent care and guardianship of the state department or of a licensed private child welfare agency;" In this case, such a decree was entered committing the permanent care and guardianship of this child to the State Department of Public Assistance. In this proceeding before the trial court, an oral motion was made to set aside the former decree of that court giving the custody of the child to the Department, and in the final decree that was done. However, in that decree, the trial court made no reference to the relinquishment contract between the mother and the Department, or to the Foster Home Agreement between the Millers and the Department. The trial court also found that the delay of fourteen months in removing this child from the Millers' home was unreasonable, and that because of the attachment of the child to the Millers removal after such a length of time would result in "serious consequences to the child, its future welfare and emotional stability." The able trial judge, in an opinion stating his reasons for the decision in this case, which was made a part of the record, stated: "* * * Pursuant to the statute, as well as the decision of the Supreme Court of the State, once a court of competent jurisdiction exercises its jurisdiction over an infant child, this jurisdiction remains continuous for the court to exercise its offices in providing for the welfare of the infant child. It is agreed by expert witnesses, as well as counsel, that no serious question would be raised should the child *had* been moved within a reasonable time by the Department from the Miller home. A reasonable time would be considered anything from one (1) month to possibly eight (8) or ten (10) months. After that period of time, however, the serious consequence of taking a child from one home and placing it in another home becomes apparent. It is under these circumstances that a court must act to some extent on a question of degree."

Black's Law Dictionary, Third Edition, defines the word "jurisdiction" thus: "The power and authority constitutionally conferred upon (or constitutionally recog-

nized as existing in) a court or judge to pronounce the sentence of the law, or to award the remedies provided by law, upon a state of facts, proved or admitted, referred to the tribunal for decision, and authorized by law to be the subject of investigation or action by that tribunal, and in favor of or against persons (or a *res*) who present themselves, or who are brought, before the court in some manner sanctioned by law as proper and sufficient."

The "jurisdiction" of the trial court to act in this proceeding has not been questioned. 49-5-1, gives Circuit Courts original jurisdiction in proceedings brought by petition under Chapter 49 to declare a minor a delinquent, or neglected child if there is no other court of record in the county having such jurisdiction by statute. Circuit Courts of this State probably do not need any such statutory powers in view of their broad constitutional powers. Their constitutional jurisdiction is substantially co-extensive with that of the English Courts of King's Bench, Common Pleas and Chancery combined. However, the word "jurisdiction" is not always used in statutes or court opinions so as to give its true meaning. Literally, it means "I speak by the law.", and comes from the two Latin words "juris" and "dico". It is the power, the right, the authority of a judge to pronounce a sentence of the law in a case or issue before him, acquired through due process of law. "Jurisdiction" does not relate to the rights of the parties, it is the power to decide a justiciable controversy between them. It is the power to decide such a controversy either way as the merits may require. 49-5-2, provides that: "* * * When jurisdiction shall have been obtained by any court of competent jurisdiction in the case of any child, such child shall continue under the jurisdiction of the court until he becomes twenty-one years of age unless discharged prior thereto or is committed to a correctional or other institution. * * *" This Court has not had occasion to construe the language of this section, and diligent research by the writer of this opinion has failed to discover a case in point elsewhere. In *Harloe* v. *Harloe,* 129 W. Va. 1, 38

S. E. 2d. 362, this Court, in construing the "continuing jurisdiction" provision of Code, 48-2-15, as amended, relating to the "care, custody, education and maintenance" of the children of divorced parents, held that due process of law requires "notice and opportunity for hearing" before the court has "jurisdiction" to change the custody of the children from one parent to the other. It was stated in the opinion that a trial court cannot "arbitrarily" change the custody of such children. The "continuing jurisdiction" provision of 49-5-2, gives the trial court no unusual or additional power. It simply prevents a former decree or judgment from becoming final and gives the trial court authority to "re-open" the matter and change the status of the infant if the parties are accorded due process of law and the evidence warrants the action.

49-6-4, provides that: "If the court finds that the interests and welfare of the child may best be served by the state department, it may commit the child to the custody and guardianship of the state department." 49-6-5, as heretofore stated, provides that in any case of a neglected child, the court may: "(3) When necessary for the welfare of the child, terminate the parental rights and responsibilities of the parent or parents of the child and commit the child to the permanent care and guardianship of the state department * * *;"

The trial court on July 30, 1956, entered an order "committing" the permanent care and guardianship of Karen "to the Welfare Division of the Department of Public Assistance." The Department at that time had a valid written relinquishment of custody from the adult mother of the child, and authority to place the child for adoption. In the *Pettrey* case, this Court said: "* * * While this Court has always guarded with great respect the natural right of parents to the custody of their infant children, it has consistently held that contracts made by parents regarding such custody must be respected, especially where the interests of the child were bettered. * * *" Former decisions of this Court are cited in support of that statement. Under those circumstances,

even though the jurisdiction of the trial court may have been continuing, it could not set aside its former order and give the permanent custody of this child to the petitioners, without very substantial evidence showing that the welfare of the child would be promoted by such act. The petitioners are agents of the Department and by seeking to adopt this child, or obtain permanent custody of it, they have violated their solemn written agreement with the Department.

Although the Legislature has, as noted by the Acts heretofore quoted, designated the Department and imposed upon it the responsibility "to provide care for neglected children who are committed to its care for custody or guardianship", it, like all others, is subject to the law, and, in a proper case, custody of an infant child can be taken from it. However, the evidence in this case does not justify such action. It is difficult to understand how the welfare of this child could be enhanced by giving its permanent custody to the petitioners. The legal custody is in the Department, and it is apparent that it will not consent to the adoption of the child by petitioners. The petitioners have a natural child who may, under the laws of descent and distribution, inherit the parents' property, whereas, this child could not. This is a child that is often designated as "illegitimate." That fact is now well known in the community in which the petitioners live because of the extended litigation incident to custody of the child. The mother of the child is aware of her presence with the petitioners, and is attempting to aid them in securing her custody. While there is a conflict in the testimony as to the effect upon the child of removing her from the petitioners' home to the home of the persons who have been selected to be her adoptive parents, it seems clear from this record, and from all human understanding of such a situation, that her chances are better with the family that has no natural children, and from which she may inherit, as would a natural child, after her adoption. It must be borne in mind that Reverend Morgan, when questioned regarding the "traumatic" effect upon Karen of her re-

moval from the Millers' home, and the likelihood that the benefits to be derived in her new home would minimize such trauma, stated that, without knowing anything about the new home, it would be difficult to give an objective answer thereto. Miss Nagy, with knowledge of both the Millers' home and the new home, stated that the benefits of the new home would outweigh much of the trauma Karen would sustain by removal. It should also be noted that, should the new home not justify the faith which Miss Nagy has shown in it, the matter will, ex necessitate, be before a trial court in any subsequent adoption proceeding. Paramount in importance is the removal of this child from the community in which she is the principal in a cause celebre because of this long and unnecessary litigation that has continued during most of her young life.

It is the view of this Court that the judgment of the Circuit Court of Wyoming County, by which it set aside its former order of July 30, 1956, committing the permanent custody and guardianship of this infant to the Department, and awarded permanent custody of the child to the petitioners, was contrary to the evidence and clearly wrong. Therefore, the decree of the Circuit Court of Wyoming County of October 5, 1957, is reversed and the cause remanded to the Circuit Court of Wyoming County with directions that the decree of July 30, 1956, awarding the care, custody and guardianship to the Department, be reinstated and the bill dismissed.

*Reversed and remanded*
*with directions.*